## EDWARDS *v.* KANSAS CITY TIMES CO.

*(Circuit Court, W. D. Missouri, W. D.* October Term, 1887.)

1. LIBEL AND SLANDER — CHARGE OF INCEST AND PREGNANCY — PARTIAL FAILURE TO JUSTIFY.

If defendant, a newspaper corporation, publishes an article stating that the plaintiff had committed incest with her brother, and was pregnant thereby, but does not attempt, either by answer or evidence, to establish the pregnancy, plaintiff will be entitled to a verdict.[1]

2. SAME.

A newspaper published a statement that plaintiff had committed incest with her brother, and was pregnant thereby. At the trial for libel it did not attempt to prove pregnancy, but introduced testimony as to the incestuous

[1] To constitute a complete defense to an action for libel, a justification, by alleging the truth of the matter charged as libelous, must be as broad as the defamatory accusation. Thompson v. Pioneer Press Co., (Minn.) 33 N. W. Rep. 856.

intercourse, which plaintiff denied. *Held*, that though technically the plaintiff would be entitled to a verdict, yet if the jury believed she were guilty of incest, her reputation could not be seriously injured by the charge.

3. SAME—CHARACTER OF PLAINTIFF—EVIDENCE.

In an action against a newspaper for libel, defendant introduced testimony to show the untruthful character of the plaintiff, and that at the funeral of two children, with whose murder the libel was connected, plaintiff was laughing, and showing a feeling of indifference. *Held*, that these facts were to be considered in estimating the true character of the plaintiff.

4. SAME—NEWSPAPER ARTICLE—SOURCE OF INFORMATION.

In an action against a newspaper for libel, it appeared that the article in question was taken from a neighboring sheet as a mere matter of news, and with no circumstances of aggravation or malice. *Held*, that the plaintiff was entitled to compensation for the injury suffered, and the manner of the publication was to be considered by the jury, either in mitigation or aggravation of damages.[1]

5. SAME—DAMAGES—TRANSACTIONS AFTER PUBLICATION.

In an action against a newspaper for libel, *held*, that matters that transpired after publication cannot be considered in mitigation of damages.

Action for Libel.

*Crosby & Rusk*, for plaintiff.

*J. W. Wofford*, for defendant.

BREWER, J., (*charging jury.*) I congratulate the parties in this case that the question between them is to be submitted to a jury of your intelligence, and one who has so patiently watched the progress of the trial. I regret to say that much of the argument of counsel on both sides has been matter of denunciation and appeal, matter which I think helps a jury very little in determining the real rights of the parties. You are not trying the case between the counsel, but between the parties, and we are to try the case upon the evidence before us. We are not to go out of this case and consider other questions, or other parties; we are not here to try over again the question of the guilt of Oliver Bateman. That murder case comes only incidentally and collaterally into this case, and the question we are to try is between the plaintiff and defendant, growing out of the fact that defendant has charged her with wrong-doing. the charge I will not read. The article which was published has been read in your hearing. It is, substantially and in effect, that this plaintiff was guilty of incest with her brother, Oliver Bateman; that is one specific important matter. It says, growing out of that incest, pregnancy followed, and that she was then with child as the result of this incestuous intercourse; and then it says that this incestuous relation, continuing and occurring on the day of the murder, was the real and primary cause

---

[1] In an action for libel evidence is admissible in mitigation of damages that the defendant believed in the truth of the charge alleged to be libelous, Morris v. Lachman, (Cal.) 8 Pac. Rep. 799; where the charge is made after reasonable and proper investigation, Bronson v. Bruce, (Mich.) 26 N. W. Rep. 671. The fact that an article published in a newspaper and charged as libelous was copied from another paper, without any actual intention of doing harm, may be shown in mitigation of damages. But this fact is no justification. Regensperger v. Kiefer, (Pa.) 7 Atl. Rep. 724. If it appear that there was no intention to injure, in the publication of a libel, and all proper precautions were observed in such publication, the amount of recovery will be limited to such damages as must inevitably have resulted from the wrong. Evening News Ass'n v. Tryon, (Mich.) 4 N. W. Rep. 267.

of the commission of that crime. Of course, these two latter charges rest upon the first and principal one,—that is, the charge of incest; and yet they are each of them contained directly, or by plain implication, in this article.

The defendant does not attempt, either by answer or evidence, to show that the plaintiff was in fact pregnant; therefore, under the pleadings as they stand, as that is a charge of matter which necessarily and naturally exposes her to the contempt of her fellow-beings, the plaintiff is entitled to a verdict, and the question which you are to determine is the amount of that verdict. It may be under the pleadings any sum from one cent, a merely nominal verdict, up to $50,000, the amount claimed. It is not an easy matter in cases of this kind to say exactly what a verdict should be. So far as the question of the amount is concerned, there is no market value. If the defendant had been charged with carrying off and destroying a thousand bushels of wheat belonging to the plaintiff, you would have little difficulty in determining how much you should award her by your verdict, for wheat has a market value. It is bought and sold day by day. But there are many things that have no market value. A limb, a life, has no market value; a man's hand is taken off in a railway accident,—there is no market value from which you can say it was worth so much; no more can you, when we are dealing with this intangible, but no less real, thing, a person's character and reputation, coin it into dollars and cents; and yet it is well settled, and justly so, that he who takes away a limb of another negligently, shall make him compensation, and he who injures another's character in like manner shall make him compensation, and in the ordinary proceedings of our legal system the question is left to the deliberate judgment of 12 men, taken from the body of the people; men of different experiences in life; men of prudence, intelligence, and integrity, who are to say what, in their judgment, will compensate the plaintiff for the injury. In this case it is a matter of compensation alone. Cases sometimes arise where a newspaper, or an individual, wantonly, maliciously, corruptly, and with the intent to degrade and destroy one's reputation, publishes a libel against him. In such cases the jury are warranted, and many times it is their duty, to do more than simply compensate,—they may give what the law calls punitive damages, that is, damages by way of punishment; and whenever a case is presented in which one occupying the responsible position of proprietor of a daily newspaper, especially one of large circulation and importance, so prostitutes his position and uses his power that, to gratify private malice, for the mere sake of punishing one whom he hates and desires to ruin, he publishes a gross falsehood against him, then my convictions and feelings are so strong and intense that I should feel it a duty which I owed to the community to urge upon a jury to give such a verdict, such a ringing verdict, as would not merely punish him for his wrong, but also be a lesson to all others occupying a similar position. Just the same as I would if, for instance, one of you jurymen, sworn to do justice between this plaintiff and defendant, should, either out of affection for the plaintiff or hatred to the

defendant, give her a larger verdict than she is entitled to, or a less verdict out of favor or through affection for the defendant,—just as in such a case I should feel that it was my duty to call upon a jury trying that case to punish you severely on account of your action.

But this case is not such a case. The plaintiff introduced no testimony tending to show that the defendant had any malice or feeling against her; on the contrary, it affirmatively appears that the article as published by the defendant was taken from a neighboring sheet as a mere matter of news, so that no circumstances of aggravation, wantonness, or malice, which justify and oftentimes compel a ringing verdict for the purpose of putting a stop to such wrong, exist in this case. I do not mean to say that that takes away from this plaintiff, in the slightest degree, the right of compensation for the injury which she has suffered. I simply mean to say to you gentlemen that it is your duty to inquire simply how much has this plaintiff been injured. What will compensate her for the wrong that has been done? And that amount she is entitled to at your hands. How are we to determine what is compensation, is the thing to be considered. It may be a matter of comparatively little moment if the offense is itself trivial. If the publication against a politician was simply that he is a liar, you might say that that was not a very aggravated charge; but when you charge a grave and serious crime against another, then the injury to character is certainly of a different kind. Now I need not say to you that a charge against any one of a crime of this character is to charge an offense of a serious nature. It is human with us; we could not be men, honest men, and not feel shocked to think that a girl would commit a crime so revolting as incest with her own brother.

Another matter for you to consider is this. What was her character,—her reputation? We use the term "character" often in two senses: in one sense it is used to refer to one's actual life; in another, and that is the sense in which we use it in this case, it is the reputation which we bear in the community. Of course, what you may say about me does not change me. If I am an honest man, if my life has been pure, the fact that every one of you may say that I am dishonest and impure does not change the fact. My life, my character in that sense is not changed; but if I have lived during 50 years of life in such a way that the community believes I am an honest man, that I am a pure man, that is my reputation in the community in which I live. If you publish a false statement that I am dishonest, that I am impure, you know how people will float this statement from one to another, until the community may come to believe that I am dishonest and impure. By this libel you have injured my reputation in the community, and that is something which every honest man prizes,—his good name in the community in which he lives. Now if it so happens that my life has been dishonest and impure, and you charge me with that, and prove that that is the fact, then I am entitled to nothing, for you have simply made public the actual truth. So, on the other hand, if, whatever may have been my actual life, the community here believes that I am dishonest, that I am

impure, then your statement to that effect makes very little impression upon my reputation; the people already believe it, already think that is so, and so I have not suffered; my reputation has not been damaged by your statement. Now go a little further: suppose it be true that I am known in the community, and justly so, as a common drunkard, a bar-room loafer, one that every man despises as he meets, and one of you should circulate or publish a statement against me that I had told a lie, or that I had stolen money. That may not have been my reputation before. People may simply have looked upon me as a mere wreck, a dissipated and worthless man, and may not have looked upon me as one who was a liar or a thief. Of course, in a certain sense, by that publication or statement you have injured my reputation; you have gotten people to believe I am worse than they thought me before; but, on the other hand, if I had such a reputation, how naturally you would say: "Well, it does not hurt much. People thought of me about as badly before as they do after the statement; my character and reputation in the community is not worth much; you cannot hurt that which is already badly injured." Now that thought comes right into this case. The defendant says that the plaintiff's character is bad; that her reputation in the community was not that of a pure, truthful, honest, upright woman; and though this specific charge may not be technically true, yet she was not hurt much, because it only added to a bad reputation that she had already. Now, in respect to her reputation, you have the testimony of these witnesses as to what it was in that community; you have also the testimony of one witness in which he says that he saw this plaintiff and her brother having improper intercourse. If it be true that she did have that incestuous intercourse with her brother, then, although it may not be true that she was pregnant as a result of that intercourse, your common sense tells you her reputation was not badly injured; she has suffered very little by this additional charge. But the plaintiff says there is no foundation for this testimony of Morgan Miller's. She says that it is not true, and you have her testimony as against his. She says, also, that upon the face of his testimony it is apparent, from its contradictions, its misrecollections, that he was not telling a true story. She says it is not true, because, as he locates himself, it was impossible for him to have looked into that little log-house and seen anything, such as he tells. She says that it is not true, because it is contrary to human experience that parties, intending such a violation of law and decency, would commit the offense in such a public manner, with the door open, and that door opening towards the house in which her parents and brothers and sisters lived, and where persons might be expected to be. It is not for me to decide these questions of fact. That is your province. I simply leave the question for you to determine, saying that it is but common sense, common justice, that if she were guilty of such an offense, though technically, your verdict must be for the plaintiff, her reputation has not been injured seriously by this charge.

Again, it is said that she perjured herself, and that fact was known, and that her reputation is that of one guilty of perjury; and it is said

that at the coroner's inquest she testified, and testified falsely, that her brother was at home on the afternoon of this murder. She says that she gave no false, no perjured testimony; that she intended to say that which was true before the coroner's jury, as well as on the evening of Thursday or Friday thereafter. It is for you to say whether her explanation is correct or not; whether she did, in fact, perjure herself or not. She further says that even if it be true that before the coroner's jury she did commit perjury, it was done through a sister's love for her brother, and to shield him from the suspicions of so revolting a crime as the murder of these two little girls. Now if you find that she did commit perjury, then the question for you to consider is, whether that explanation takes away the moral quality of this offense; whether there is an apology, excuse for a sister, believing her brother innocent of a crime, to perjure herself to shield him from suspicion. While, of course, it would not detract in the slightest degree from the legal character of the offense, it would not make her any the less a perjurer, yet it is for you to say whether that did or did not take away the moral enormity of the offense. Now, taking all these things together, what was the character of this female plaintiff? Was it good or bad? And according as it is good or bad, so it is more or less injured by the accusation made against her in this particular; for, as I said at the outset, to charge against a pure woman, one known to be pure, and having a good reputation in the community, such an offense is a serious accusation. To charge that against one who has forfeited her good name by her own conduct is not so serious an accusation.

Another matter I forgot to notice, and that is, the testimony of one or two witnesses as to her conduct at the time of the funeral of these little girls, as well as the testimony of one or two witnesses as to her conduct at the times these gentlemen called upon her at the house. Some of these witnesses say that in the sad hour of that funeral this girl was there laughing, and making apparently light of the sad events which were passing, and that she seemed at the time of this interview to be laughing, or snickering, manifesting a feeling of indifference. Now if that is all true, it simply throws light upon the question of the girl's character. Of course it does not follow from that that she was impure or untruthful, but it is simply a circumstance to place before you the real, true character of the plaintiff. Now the defendant says, conceding all the plaintiff claims, conceding that she may be a pure girl, conceding she may have been a truthful girl, conceding her reputation is perfectly good, yet this article was published, not from any malice against the plaintiff, not through any negligence, or picked-up information obtained from listening to the scurrilous story of some disappointed and disgruntled neighbor, but was published as a matter of news, taken from a respectable sheet, published in the vicinity of this murder, and that is a matter to be considered by the jury. Although a newspaper may be actuated from no personal malice, and have no private feelings to gratify, yet a case might arise where, with great negligence, it takes a story from some irresponsible party, who seeks this way of getting a libel before the

community. Take this very case: suppose there was some one in this little village of Flag Springs who, through business troubles, through jealousy, or from ill will, desired to wrong and injure the plaintiff, and came to any newspaper and told such a story as this, and without any inquiry of the responsibility of the party telling it, without any efforts to find out the truth, such paper published the charge, you would feel that there was negligence on the part of the defendant,—an indifference to the rights of others which certainly would demand serious attention at your hands; for the law is that a man cannot shield himself from responsibility for a libel by the fact that some one told him, and if he took the statement of some person whom at the time he did not know,—took the statement of such person without making any fair and reasonable inquiry,—you would very properly say that that was negligence on his part, and he should be held to a fuller and larger responsibility. The defendant says it did nothing of this kind; that it found in a responsible sheet, published in the vicinity of this murder, this item of news, and published it without head-lines, or without anything to attract unnecessary attention, as a matter of news affecting such a terrible tragedy as this. Of course I do not mean to say that the fact that the information in this article was thus obtained, relieves the defendant of responsibility, or justifies you in failing to give compensation to the plaintiff for the damages which she has suffered; but it is a matter to be considered by you, because it is a function and duty of newspapers to furnish information to its readers of the current events. I say, it would be a physical impossibility to send an agent to every place, where events, tragedies are transpiring, to ascertain by personal examination the exact facts. A paper could not give us all which we have a right to hear of the current events of the day. When Garfield was shot every man in the land was eager to know all the particulars in full, with all information concerning the event and its surroundings. Suppose, in such a time as that, a paper in the far west published an untruthful statement coming by the associated public press dispatches, or borne to it from some Eastern and reputable paper, which represented something about an individual in Washington which was not true, the paper would take the risk of the untruth, and must compensate for any damages which were suffered, but at the same time it would be acquitted of that which we call negligence and wantonness in the publication; and so the defendant, conceding for this question all that the plaintiff may claim, says it simply discharged the functions of a newspaper, gathering from all quarters of the land information respecting every event of public interest, and that this fearful murder of these innocent children was something which sent a thrill of horror through all this western community, and that every fact connected with it was eagerly sought after, and so in the honest and faithful discharge of its duties to the public it published that which it had every reason to believe was the truth. These matters are to be considered on one side or the other of aggravation, or mitigation of damages. You are to see to it that plaintiff is compensated for the injury which her character has sustained; but while doing that you are

not required to render such a verdict as will put a check and stop upon the legitimate pursuit of information in respect to matters of public interest.

Of course you will look at this question of mitigation as it is suggested in view of the facts that transpired before the publication. Any matters which have transpired subsequently thereto, do not come in to mitigate. At the time the publication was made, what was the condition of affairs? Upon what was it made, and was it upon a reasonable or unreasonable belief in the truth of it? There is another rule of libel, that where the party, having been sued for libel, justifies, as it is called,—that is, comes in by answer and says the charge is true,—that is to be considered as a repetition of the libel; that the party, if it was not true, should say it is not true, and should offer merely his matter in mitigation of damages. On the other hand, if defendant had reasonable ground to believe it was true, it had a right to have that fact inquired into by a jury, and may tender that defense in his answer; and though he may fail, and though he may not justify as to the whole charge, may not say that it is all true, he is at liberty to come in and say a part is true, and, as to the whole I published under these circumstances. You are the sole judges of the credibility of all the witnesses. It is not my province to say that any witness has or has not told the truth. Many of them you have seen; heard from their lips their story; seen their appearance on the stand. The others have spoken to you through their depositions, after examination and cross-examination, and you have heard their story with their contradictions, if any, and it is for you to say how much credence you will give to any and all. I believe, gentlemen, that is all I need to say to you. I commend this case to you, believing that you will do what is right, and justice between this plaintiff and defendant. It is, of course, not the idea of libel suits that the plaintiff is to make money and speculate out of her reputation. What a libel suit means, in cases where there is no willful misconduct, is that the plaintiff shall be compensated for the damages which her or his character may have suffered. Here is this case; it is for you, as 12 sensible, intelligent men to say by your verdict how much this plaintiff's character and reputation has been in fact damaged by the publication of this article in the Times. When that amount is found you will name it in your verdict. The form of your verdict will be this: " We, the jury, find for the plaintiffs, and assess their damages," (because husband and wife join as plaintiffs,) " at the sum," which you will name, and which you all agree upon as a fair compensation to her.

The jury found for the plaintiff in the sum $500.