. THE PEOPLE, Plaintiff

v.

ROTHSCHILD FRANCIS,
Defendant

# November Term, 1924
# No. 9
# District Court of the Virgin Islands
St. Thomas and St. John Sub-Judicial District

# February 13, 1925*
*Same case on appeal, see p. 567, this volume*

*As taken from Ttranscript of Record in the United States Court of Appeals, Third Circuit.

CHARLES H. GIBSON, *Government Attorney, for the People*
C. G. THIELE, *for defendant*

WILLIAMS, *Judge*

As will be seen from the Statement of Facts in this case, the primary question is one of libel, but in every case of this character the question of the "freedom of the press" is brought out in bold relief. As the Anglo-Saxon view of libel and the "freedom of the press" has only recently made its advent in this community, it may be well to make some general, and at times particular, remarks in relation to its genius and in elucidation thereof.

The powerful position of the newspapers in our day, and their supreme importance, both for good and evil, has been set forth succinctly by one of the greatest newspaper men of the past generation — Joseph Pulitzer — as follows:

"Our Republic and its press will rise and fall together. An able, disinterested, public-spirited press, with trained intelligence to know the right, and courage to do it, can preserve the public virtue, without which popular government is a sham and a mockery. A cynical, mercenary, demagogic, corrupt press will produce in time a people as base as itself."

The effect of this great instrumentality upon the present-day public is very well depicted by a rather taciturn British statesman of this generation, who said:

"He does not see what power in the country can withstand the domination of a commercialized Press. If newspapers with a great circulation, chiefly among people who have never been trained to think and whose opinions are forever at the sport of mere suggestion, repeat day after day something which they want that public to believe, repeat it in a dozen forms and ever with

69

some new and striking attraction, he does not see how democracy will be able to save itself from such perilous suggestion.

"A newspaper proprietor has only to give orders for his journalists to announce, and to go on announcing, that the Government, whatever Party it may represent, is stupid and inept, for that Government, sooner or later, to fall. The newspaper proprietor may be right, and he may be moved by the highest patriotism; but he may also be wrong, and he may also be actuated by either the basest of motives or by the mere pique of hurt vanity. How does the Country propose to guard itself against this domination at the hands of two or three men who have turned to journalism, not as a man turns to a school-mastering or to preaching, but for the sake of money or for their own personal aggrandizement?

"What is the effect of the worst of these newspapers on English character? Do they steady the national judgment? Do they stimulate the reason, or incite the passions? Do they enlighten the mind, or vulgarize the heart? We see the screaming headlines in the streets and dismiss them without a thought, merely with a feeling of disgust or contempt; but what work are they doing in the minds and characters of the multitude — good work or bad work? Every newspaper is either helping or hindering civilization. We make a mistake in dismissing them as things of no account. They count enormously. Day after day they are at work on the mind and in the character of the vast masses of this Country, and no other influence is to be compared with theirs in the matter of shaping the moral destinies of our Nation."

"The Windows of Westminster," p. 133, et seq.

Their implication clearly is that great, even irreparable, harm may, and will, come through this powerful instrumentality if in either ignorant or corrupt hands, and it is against the trade of such people — in the garb of editors — that the law should ever hold a deferring hand and keep a vigilant eye to prevent the people from being anaesthetized and responding to their diabolical influence. It is the Court's business to stop this; if not, whose is it? — assuming that the legislative branch of the Government has placed it within their power.

In order to develop an atmosphere about a case of this kind, it may not be improper to quote Anthony Trollope, in "The Warden," who rather classically describes a newspaper, the great goddess Pica, of the middle of the Nineteenth Century (and his psychology is still sound, only the character of the building has changed, and even that not here), its power and pretentions, its egotism and smugness, its omniscience and ubiquity, and, to sum it all up, its infallibility, — thus:

"Who has not heard of Mount Olympus — that high abode of all the powers of type, that favoured seat of the great goddess Pica, that wondrous habitation of gods and devils, from whence, with ceaseless hum of steam and never-ending flow of Castilian ink, issue forth fifty thousand nightly edicts for the governance of a subject nation?

"Velvet and guilding do not make a throne, nor gold and jewels a sceptre. It is a throne because the most exalted one sits there — and a sceptre because the most mighty one wields it. So it is with Mount Olympus. Should a stranger make his way thither at dull noonday, or during the sleepy hours of the silent afternoon, he would find no acknowledged temple of power and beauty, no fitting fane for the great Thunderer, no proud facades and pillared roofs to support the dignity of this greatest of earthly potentates. To the outward and uninitiated eye, Mount Olympus is a somewhat humble spot — undistinguished, unadorned, — nay, almost mean. It stands alone, as it were, in a mighty city, close to the densest throng of men, but partaking neither of the noise nor the crowd; a small, secluded, dreary spot, tenanted, one would say, by quiet unambitious people at the easiest rents. 'Is this Mount Olympus?' asks the unbelieving stranger. 'Is it from these dark, small, dingy buildings that those infallible laws proceed which Cabinets are called upon to obey; by which bishops are to be guided, lords and commons controlled, — judges instructed in law, generals in strategy, admirals in naval tactics, and orange-women in the management of their barrows?' 'Yes, my friend — from these walls. From here issue the only known infallible bulls for the guidance of British souls and bodies. This little court is the Vatican of England. Here reigns a pope, self-nominated, self-consecrated — ay, and much stranger too —

self-believing! — a pope whom, if you cannot obey him, I would advise you to disobey as silently as possible; a pope hitherto afraid of no Luther; a pope who manages his own inquisition, who punishes unbelievers as no most skilful inquisitor of Spain ever dreamt of doing — one who can excommunicate thoroughly, fearfully, radically; put you beyond the pale of men's charity; make you odious to your dearest friends, and turn into a monster to be pointed at by the finger!'

Oh heavens! and this is Mount Olympus!

So much for the lair — then:

"It is a fact amazing to ordinary mortals that the Jupiter is never wrong. With what endless care, with what unsparing labour, do we not strive to get together for our great national council the men most fitting to compose it. And how we fail! Parliament is always wrong: look at the Jupiter, and see how futile are their meetings, how vain their council, how needless all of their trouble! With what pride do we regard our chief ministers, the great servants of the state, the oligarchs of the nation on whose wisdom we lean, to whom we look for guidance in our difficulties! But what are they to the writers of the Jupiter? They hold council together and with anxious thought painfully elaborate their country's good; but when all is done, the Jupiter declares that all is nought. Why should we look to Lord John Russell — why should we regard Palmerston and Gladstone, when Tom Towers without a struggle can put us right? Look at our generals, what faults they make; at our admirals, how inactive they are. What money, honesty, and science can do, is done; and yet how badly are our troops brought together, fed, conveyed, clothed, armed, and managed. The most excellent of our good men do their best to man our ships, with the assistance of all possible external appliances, but in vain. All, all is wrong — alas! alas! Tom Towers, and he alone, knows all about it. Why, oh why, ye earthly ministers, why have ye not followed more closely this heaven-sent messenger that is among us?

"Were it not well for us in our ignorance that we confided all things to the Jupiter? Would it not be wise in us to abandon useless talking, idle thinking, and profitless labour? Away with the majorities in the House of Commons, with verdicts from the judicial bench given after much delay, with doubtful laws, and the fallible attempts of humanity! Does not the Jupiter, coming forth

72

daily with fifty thousand impressions full of unerring decisions on every mortal subject, set all matters sufficiently at rest? Is not Tom Towers here, able to guide us and willing?

"Yes, indeed, — able and willing to guide all men in all things, so long as he is obeyed as autocrat should be obeyed — with undoubting submission; only let not ungrateful ministers seek other colleagues than those whom Tom Towers may approve; let church and state, law and physic, commerce and agriculture — the arts of war, and the arts of peace, all listen and obey, and all will be made perfect."

And then he turns to the personality of the editor, and, inter alia, exultantly, almost, seems to exclaim:

"No man knows who wrote the bitter words; the clubs talk confusedly of the matter, whispering to each other this and that name; while Tom Towers walks quietly along Pall Mall, with his coat buttoned close against the east wind, as though he were a mortal man, and not a god dispensing thunder-bolts from Mount Olympus."

And with this Parthian shot he closes:

"It is probable that Tom Towers considers himself the most powerful man in Europe; and so he walked on from day to day, studiously striving to look a man, but knowing in his breast that he was a god."

The above is not a very greatly exaggerated depiction of the attitude of a large portion of the Press, and it is this spirit which rushes them past the legal limits of their right. In their superior wisdom and the plenitude of their power, they presume to direct the activities of the Government and mercilessly to vilify and abuse any public official who happens to cross the path of their interest or whatever course they may be pursuing. This is particularly characteristic of this community, at least respecting a portion of the press. Half-baked notions and ill-considered thoughts are brought to bear upon partial facts, resulting in a totally misinformed public, many of whom are only too credulous or too willing to believe the worst that may be said about a public official.

73

Many newspaper editors (and there are many so-called newspapers) think that under the great panoply of "freedom of the press" they can find umbrage for their ulterior motives and spurious actions. Liberty of the Press! "Oh, Liberty, what crimes are committed in thy name! They try to confuse 'license' with 'liberty', and I may say, with Judge Kimbrough Stone: 'Their error is the age-old one — confounding liberty with license. How closely liberty is bound to license when our appetites knit them together! How twin-like smile they at us from the mirror of desire. They sometimes seem so much alike that it requires sober thought to tell one from the other. These warped and twisted views of liberty will fool no one but these gentlemen. We don't see in them the patriot salvaging the torch of liberty. They do not well assume the character of Vestal Virgins to that sacred light'." Am. Law Rev. (May-June, 1923), page 388.

Such persons as Judge Stone describes, in their hearts, and oft-times publicly, wail with Jacques (in "As You Like It"): "I must have liberty withal, as large as charter as the wind, to blow on whom I please."

Owing to the hustle and bustle, the intricacies and complexities, of our civilization, it is utterly impossible for the general public to attempt to verify everything read in the voluble and voluminous newspapers of today. Therefore, they are apt, if not obliged, to say, with Rabelais: "The thing is written; it is true."

In this state of public credulity, that, as we have just said, exists as of necessity, the newspaper can, and many times does, presume on that credulity and act on Mark Twain's advice: "Get your facts first, and then you can distort them as you please."

Therefore, such, with some "wit and no money," just go on and "write, write, write, anything; the World's a fine believing world; write news."

74

While it is admitted on all hands that the newspaper can be one of the greatest forces for good, it at the same time may be a very pernicious force if wrongly directed. Therefore, the great problem is to provide for the greatest freedom of expression, in order to assist in the development and sustaining of an enlightened public opinion, and at the same time to furnish checks against the evils innately inherring in this subject.

The doctrine of "Liberty of the Press" is one largely restricted to English-speaking countries and the Western Hemisphere, as many of the continental European nations provide for governmental regulation of the Press. This doctrine had its genesis in the perfection of movable type by Johannes Gutenberg, between 1438 and 1450, from which, of course, has been developed the modern art of typography. Its baneful, as well as good, influence was early felt, and found expression in the Bull of June 1, 1501, of Pope Alexander the VI, and the latter was, as a consequence thereof, the inventor of "Index Expurgatorius."

The famous Sir Thomas More, in his "Utopia" (published about 1511), states his belief that to maintain order it will be necessary to regulate the Press. Parliament published a seditious book act in 1534, prohibiting printing except by licensed printers, and a rigid censorship was established in 1542. Printing was to be done under Government supervision. Finally, the Star Chamber ordinance against the Press (1556) prohibited all printing except at Oxford, Cambridge and London. These prohibitory measures brought on considerable agitation, and resulted in several very famous cases. Milton inveighed against them in his "Areopagitica." While the Censorship Act was abolished in 1695, prosecutions for seditious writing were still continued into the next Century, such as the case of Entwick v. Carrington, and the Stockdale case.

Though censorship was technically abolished in England in 1695, the colonies were subject to the old law until 1725. After the revolution was started a number of States guaranteed in their Constitutions "the freedom of the press," which was later secured in the Fedral Constitution. For a time there was quite a struggle between the judges and the juries, the latter finally acting on the assumption that they had the right to pass on the law as well as the facts in such cases, resulting in an emasculation of the prohibitory laws such as remained.

There is considerable misapprehension among the laity as to just what "freedom of speech and of the press" means. The liberty of the press has been described by Blackstone, Vol. 4, Comm. 151, thus: "The liberty of the Press . . . consists in laying no previous restraints upon publications, and not in freedom from censure for criminal matter when published."

The Maryland Constitution, which may be considered as typical, provides: "That the liberty of the Press ought to be inviolably preserved; that every citizen of the state ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege." And in construing this Constitutional provision in Negley v. Farrow, 60th Md., 158, 176; 45 Am. Rep. 715, the Court said: "The liberty of the Press guaranteed by the Constitution is a right belonging to every one, whether proprietor of a newspaper or not, to publish whatever he pleases, without the licensed interference or control of the Government, being responsible alone for the abuse of the privilege. It is a right which, from the introduction of the printing press down to the year 1694, did not in England belong to the subject. On the contrary, no one was allowed to publish any printed matter without the license and supervision

of the Government, and it was against such interference on the part of the Government, and in favor of the right of the citizen, that this provision found its way into our Bill of Rights."

Judge Cooley, in his "Constitutional Limitations," at 602, says: "It is conceded on all sides that the common law rules that subjected the libellor to responsibility for the private injury, or the public scandal or disorder occasioned by his conduct, are not abolished by the protection extended to the Press in our constitutions. The words of Chief Justice Parker, of Massachusetts, on this subject, have been frequently quoted, generally recognized as sound in principle, and accepted as authority. 'Nor does our constitution or declaration of rights', he says, speaking of his own State, 'abrogate the common law in this respect, as some have insisted. The sixteenth article declares that "liberty" of the press is essential to the security of freedom in a State; it ought not, therefore, to be restrained in this Commonwealth.' The liberty of the press, not its licentiousness: this is the construction which a just regard to the other parts of that instrument, and to the wisdom of those who founded it, requires. In the eleventh article it is declared that 'every subject of the Commonwealth ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property, or character': and thus the general declaration in the sixteenth article is qualified. Besides, it is well understood and received as a commentary on this provision for the liberty of the press, that it was intended to prevent all such previous restraints upon publications and has been practiced by other governments, and in early times here, to stifle the efforts of patriots towards enlightening their fellow-subjects upon their rights and the duties of rulers. The liberty of the press was to be

unrestrained, but he who used it was to be responsible in case of its abuse; like the right to keep fire-arms, which does not protect him who uses them for annoyance or destruction."

■ Many seem to think that these constitutional provisions give newspapers a greater latitude than private citizens would have, but this is clearly erroneous, as all of the authorities show. The Court, in Stuart v. Press Pub. Co., 83 App. Div. 467, has this to say: "Liberty of speech and of the press is guaranteed by the supreme law of the land, and will be zealously guarded, preserved, and enforced by the courts. The provisions in Federal and State constitutions were designed to secure the rights of the people and of the press for the public good, and they do not license the utterance of false, scandalous or libellous matter. Individuals are free to talk, and the press is at liberty to publish, and neither may be restrained by injunction, but they are answerable for the abuse of this privilege in an action for libel and slander under the common law . . ."

In the famous case of People v. Croswell, 3 Johns. Case, 337, 393, it was said: "Freedom of the press does not mean 'a press wholly beyond the reach of the law, for this would be emphatically Pandora's Box, the source of every evil. The founders of our governments were too wise and too just ever to have intended by the freedom of the press a right to circulate falsehood as well as truth, or that the press should be the lawful vehicle of malicious defamation, or an engine for evil and designing men to cherish, for malicious purposes, sedition, irreligion, and impurity'." See Schenck v. United States, 249 U.S. 47, 39 S. Ct. 247, 63 L. Ed. 470; Frohwerk v. United States, 249 U.S. 204, 39 S. Ct. 249, 63 L. Ed. 561; Debs v. United States, 249 U.S. 211, 39 S.

Ct. 252, 63 L. Ed. 566; Abrams v. United States, 250 U.S. 616, 40 S. Ct. 17, 63 L. Ed. 1173.

It will, thus, be seen that while censorship has been lifted these many years, the time is not yet when any vagabondish or irresponsible person may procure a printing press, by hook or crook, and belabor people at his will, in utter disregard of the truth and their rights.

While the above matter seems to take on the aspects of a diatribe, it is, in reality, a serious portrayal of a real condition, and is, therefore, not an exotic element in this case.

■ To correct such evilly disposed persons, the law of libel has been established, which in this jurisdiction has been defined, as follows:

"A libel is a malicious defamation, expressed either by writing, printing, or by signs or pictures, or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue, or reputation, or publish the natural or alleged defects of one who is alive, or any body corporate, or of any religious denomination, or organization existing in the District, and thereby expose him to public hatred, contempt or ridicule." Section 36, chapter 4[5], Title V[IV], of the Code (1921; 14 V.I.C. § 1171).

The above general statement of the law is limited by section 39 of the same chapter (14 V.I.C. § 1174), as follows:

"In all criminal prosecutions for libel, the truth may be given in evidence, and if it appears to the Court that the matter charged as libellous is true, and was published with good motives and for justifiable ends, the party shall be acquitted."

The above sections fairly state the law of libel as it exists in America today, and the American cases on the subject are applicable here.

■ The article which prompted the prosecution in this case has been set forth in the "Statement of Facts" in this case, as follows:

## "A NATIVE BATESKO?"

"Something is wrong with our Police Force, everybody is saying. Recently a policeman fired a shot which lodged in the tub of a private citizen, then he attempted a false arrest, and before we were about to go to press he used his club in a brutal manner on a woman that he was ordered to take home, we understand. Merchants and other citizens are indignant. How long, O Justice! How long?"

The article on its face betrays no false premise of fact, as it goes right along mixing opinion and fact, so that any one reading it would be left no room for speculation or thought on the subject. It is a clear and definite statement of criminal acts on the part of the police officer, Mathias. It depicts a wild and unrestrained character, an irresponsible and bestial person, who has been invested with the shield of the law, but who goes about disturbing the public peace and recklessly endangering the lives and liberty of the people, and calls for what would seem condign punishment. It is apparent, from the said article, that the "Emancipator" is endeavoring to crystallize opposition to the police force; that the Editor of this paper is endeavoring to bring the whole force into disrepute, and, therefore, of the contempt of the community, — for does he not say that "Everybody is saying", "something is wrong with our Police Force?" Then he proceeds to make an attack on a particular policeman against whom, according to the testimony, he had made protests at the time of this officer's appointment, thus showing a motive for distorting whatever may be done by that officer anywhere approximating the twilight zone between duty and unlawful act. In other words, having objected to this officer, he now proceeds to distort and contort such things as are susceptible of either in order to make his protests good. Furthermore, it appears that the police officer would not associate himself with the organization in which the Editor of the "Eman-

cipator" was, at least at one time, the moving spirit, albeit that spirit may now be exorcised.

If the said newspaper had set out just what the facts were in the Saban district on the occasion in question, people would then have been privileged to draw such conclusions as their individual intelligence would have permitted, but the Editor did not vouchsafe to them that privilege. He not only wished to state the facts as he wished them to be, but drew the conclusions for his readers as well. What conclusion could be drawn from the first clause of the last paragraph of his article, but that the policeman unlawfully discharged a shot from his revolver? What did he intend to be the natural conclusion to be drawn from that clause? If he did not intend that the citizen should conclude therefrom that the policeman had recklessly and unlawfully fired the shot, what was the sense of publishing that incident? It must be borne in mind that he was endeavoring to establish as a fact that "something is wrong with our police force," and it must be in the light of that statement that the subsequent matter is to be considered. The second clause of that paragraph states that "then he attempted a false arrest." The testimony, as above set forth, shows that one of the gang in question was taken into custody, albeit he was never prosecuted. Admittedly having been one of the persons who would be most likely to know the offenders, it was most natural and justifiable that this means of ascertaining the names of the culprits should be availed of. If the officer had not taken him into custody he would have laid himself open to a charge of dereliction of duty. Therefore, instead of attempting a false arrest, he did what the law strictly enjoined upon him and for the non-doing of which he would have been liable to punishment by his department.

The third clause of the article declares that "Before we were about to go to press, he used his club in a brutal manner on a woman that he was ordered to take home, we understand." From that statement we do not gather than any substantial investigation was made with the idea of verifying this story of brutality. The publication is based simply on understanding, and not on investigation. It is simply a reaching out at the last moment for anything that might possibly augment the preceding charges, and this in utter disregard of the facts as they would have been revealed to the Editor if he had exercised such precaution as a person who has any regard for the rights of others ought to have exercised.

The whole article shows an utter and reckless disregard of the rights of the police officer in question; that if the Editor had the actual facts in and, he acted upon the aforesaid advice of Mark Twain, — "Get your facts first, and then you can distort them as you please." That principle is characteristic of the whole article, which though short in news, is extremely long on matter and implication. A reading of this article will raise up in one's mind a picture of an ogre, a most dangerous character parading in the habiliments of the law; one who is not only not worthy of holding the scales of Themis, but is unworthy even to touch her shoe latches; one who is not a protector of the law, but a despoiler. Can any one who reads the facts of the case conclude that the firing of the pistol in the circumstances existing on that dark night was anything but a justifiable act? There is some diversity of testimony on the point as to whether or not the shot was fired in the air or into a fence. In either event it would indicate that he was endeavoring to fire it in a direction which would cause no harm, and that he exercised reasonable judgment in so

doing. That the throwing of stones is a dangerous, even deadly, act, needs no demonstration in this community; it is a practice that has been continued notwithstanding persistent efforts to break it up. That district of the community is infested with a number of vagabondish characters who are continually giving offenses of one kind or another. To the same class belongs the woman who is alleged to have been brutally beaten; they are lawless and reckless to the Nth degree, and within the last six or eight months several of that same type recklessly and wantonly murdered a peaceful citizen while he was walking along the public highway accompanied by female friends. When dealing with this class of people the police have to be, naturally, more vigilant and cautious than when dealing with an ordinary offender, and they are justified in adopting more extreme measures.

The publication of such articles as the one in question is calculated to sustain these lawless people in their activity and to dampen the ardor of the police force in suppressing them. By this agitation these offenders get aid and comfort, while the law-enforcing agencies are objects of contumely and hatred. That the defendant is endeavoring to extend this hatred and contumely is readily seen at the conclusion of the alleged libellous article, where he says that "merchants and other citizens are indignant." He is trying thereby to give respectability to a hoodlum element, and to generate indignation in the minds of respectable people. One of the principal vices of this article, as with many other articles of like character, is that it is a combination of editorial and reportorial work; it is a garbled statement of fact coupled with the prejudiced opinion of the defendant; it is a malicious attempt on the part of the defendant to establish reasons for venting his spleen upon, and expressing his contempt for, the police department of this community, formed,

83

with the exception of the Director of Police, entirely of natives and of his own race (Negro); it is a clear attempt to gather and add fuel with which to inflame volatile minds, and thereby consolidate, and keep consolidated, the element to which the "Emancipator" caters.

■ It will, thus, be seen that all of the substantial elements of the charges against the police officer in question are without foundation in fact, and are thoroughly tinctured, if not permeated, with malice. Therefore, as the charges are untrue, the saving features of said section 39 of the Code (supra), to wit: "good motives and justifiable ends," if they exist, will avail the defendant nothing. The three elements, "truth, good motives, and justifiable ends," must concur; when any one of these elements is missing the conditions of the said section 39 have not been met.

· ■ ■ At page 950 of 18 Am. & Eng. Ency., it is stated that: "A writing which imputes to an officer a high crime and misdemeanor in office is a criminal libel; . . ." And in 25 CYC. 269, it is said that: "Any written or printed statement which falsely or maliciously charges another with the commission of a crime is libellous per se." See: Palmer v. Mahin, 120 Fed. 723; Press Pub. Co. v. McDonald, 63 Fed. 238, 26 L.R.A. 53; and numerous cases cited in the foot-note to the above text. That authority (25 CYC), on this point, continues: "Indeed, to charge a person with that which, although not criminal yet degrades him in the eyes of the public, or exposes him to contempt or ridicule, is libellous per se."

These are universal principles of law, and are equally applicable here and in the States.

■ And at page 568 (25 CYC), it is further stated: "An indictment or information, as the case may be, will lie for publishing words charging corruption or misconduct·on the part of a public official, as well as for pub-

84

lishing words imputing that such official is unfit to hold office." Richardson v. State, 66 Md. 206; State v. De-Long, 88 Ind. 312; State v. Norton, 89 Me. 290; State v. Lyon, 89 N.C. 568; Burdett v. Comm., 103 Va. 838.

The article in question would certainly seem to come within all of these condemnatory elements of law.

■ Nor can he, the defendant, hope to escape responsibility on the ground that the matter was news. In 25 CYC, 405, it is, on this subject, said: "Newspapers, as such, have no peculiar privileges. Defamatory matter published in good faith, in an honest belief in its truth, if false is not privileged, because published as a mere matter of news." Edwards v. Times Co., 32 Fed. 813; Gilman v. McClatchy, 111 Cal. 606, 44 Pac. 241; Republican Pub. Co. v. Conroy, 5 Colo. 262, 38 Pac. 423; Haynes v. Clinton Printing Co., 169 Mass. 512.

■ ■ And on the subject of "Public Criticism and News," at page 401 (25 CYC), it is said: "It is sometimes said that fair and honest criticism in matters of public concern is privileged. But in other cases a distinction is drawn between an ordinary privileged communication and the so-called privilege of fair criticism. The interests of society require that immunity should be granted to the discussion of public affairs and that all acts and matters of a public nature may be freely published with fitting comments or strictures. But the privilege is limited strictly to comment and criticism, and does not extend to protect false statements, unjust inferences, imputations of evil motives, or criminal conduct, and attacks upon private character, the publisher being responsible for the truth of what he alleges to be facts." Snyder v. Fulton, 34 Md. 128, 6 Am. Rep. 314; Fenstermaker v. Tribune Pub. Co., 13 Utah 532, 40 Pac. 1097, 35 A.L.R. 611; Byrne v. Funk, 38 Wash. 506, 80 Pac. 772; Wilson v. Fitch, 41 Cal. 363.

So, it will be seen from the above citations, that the defendant does not come within the saving provisions relative to public news or fair criticism of public news.

If the defendant had desired to have action taken as a result of any misconduct on the part of the police officer, his complaint should have been lodged with the proper department, and he should not have engaged in an effort to have a mob trial of a man who had no means of making as public a defense as the charges had been made in. The disadvantage at which this officer would be placed in such a contest is so apparent that any remarks on that point would be entirely superfluous. In 25 CYC, 388, it is said: "The selections of suitable persons for the performance of official service is essential to the interests of both the government and the citizen, and hence communications to the appointing power, or, it has been held, to an officer whom defendant might naturally suppose could prevent the appointment, with reference to the character and qualifications of candidates for public office, are generally regarded as illustrations of qualifiedly or conditionally privileged publications, and in such cases no action will lie for false statements in the publication unless they are also malicious, and the burden of proof in this respect rests upon the plaintiff."

The validity of this exception, if exercised rightly, is, of course, clearly recognizable. But there is no reason for a rule authorizing the general and public vilification of an applicant for an office or an officeholder. It is fair to assume that he could get a fair hearing before the competent authority, and therefore he would not be prejudiced by any false statements made, but it is unfair to assume that he could get a fair trial before the public with a newspaper as the attacking party. Mob trials find no support in America, and should not find any

86

here, and do not. Even if the defendant attempted to escape responsibility on this ground he could not do so, because there is clear and definite evidence of actual malice, certainly of legal malice, as there is no evidence in the case whatsoever showing, or tending to show, that any investigation was ever made by defendant to ascertain the truth or falsity of the matter published. With all of the witnesses that were produced, there is not a scintilla of testimony showing, or tending to show, that this publication was based on anything more than the most fragmentary and nebulous rumors, a most unreliable source of information in this community, as in most other communities. There was no attempt to show good faith in making the publication; not a witness was produced to this end; nor a scintilla of evidence offered in any way on this point.

To be sure, some witnesses were produced with the idea of showing the truth of the matter contained in the article, but nothing was said as to any investigation having been made prior to the publication thereof. For aught that can be seen from the testimony, a reckless use of partial facts, not for the purpose of publishing news merely, but for the purpose of a general detraction of the police department, and particularly of the officer in question. If news had been the design of the article, facts would have been published, and not what amounts to an opinion of the author. This article was more a criticism than news, and one to incite the popular mind against the whole police department, while at the same time wreaking vengence on one of its members against whom he had a vindictive feeling.

From the above it will be seen that the defendant comes clearly within the condemnation of said section 36 of the Code, and has, therefore, been found guilty of the crime of libel.